## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION
## No. 7:13-CR-90-D

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) **ORDER** |
| JERMAINE CORDOVA, | ) |
| | ) |
| Defendant. | ) |

On March 26, 2014, Jermaine Cordova ("Cordova" or "defendant") pleaded guilty, without a plea agreement, to a one-count indictment charging possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1). The statutory maximum punishment for this offense is 10 years' imprisonment. See 18 U.S.C. § 924(a)(2). If, however, the defendant is deemed an armed career criminal under the Armed Career Criminal Act ("ACCA"), id. § 924(e), the statutory minimum punishment becomes 15 years' imprisonment, and the statutory maximum punishment becomes life imprisonment.

On July 15, 2014, the court began Cordova's sentencing hearing. See [D.E. 59]. The court considered the evidence presented and the arguments of counsel regarding two of Cordova's objections to the Presentence Investigation Report ("PSR") [D.E. 54], and overruled both. See Sentencing Tr. [D.E. 64] 8–124; PSR add. ¶¶ 2–3. The court then continued Cordova's sentencing hearing and ordered both parties to submit briefs regarding whether Cordova's criminal record makes him an armed career criminal subject to an enhanced sentence under 18 U.S.C. § 924(e). See Sentencing Tr. 135–38. On July 21, 2014, each party submitted a memorandum of law. See [D.E. 65, 66].

On September 4, 2014, the court completed Cordova's sentencing hearing. After considering

the parties' briefs and the arguments of counsel, the court determined that Cordova's criminal record

does make him an armed career criminal. The court then considered the arguments of counsel,

Cordova's statement, and all relevant factors under 18 U.S.C. § 3553(a), and sentenced Cordova to

420 months' imprisonment. The court enters this order to explain Cordova's sentence.

I.

On January 2, 2013, Cordova contacted a female stripper and asked her to strip for Kareem

Demond Thomas ("Thomas") for $500. See PSR ¶ 3.[1] The stripper agreed and contacted Thomas,

who met the stripper at her apartment in Wilmington, North Carolina. When Thomas arrived at the

apartment, Cordova and Christopher Dashawn Williams ("Williams") ran toward Thomas, each

brandishing a firearm. When Thomas attempted to flee, Cordova or Williams shot Thomas in the

leg. Thomas fell to the ground, and he was shot four more times. Cordova and Williams then went

through Thomas's pockets and stole various items from him. Thomas suffered serious injuries and

required emergency medical treatment. See id.

Officer Lee Odham ("Officer Odham") interviewed Thomas. See Sentencing Tr. 64–66.

Thomas identified Williams as one of the individuals who robbed him and shot him. See id. 66–68.

Thus, the Wilmington Police Department obtained an arrest warrant for Williams. See id.

On January 29, 2013, Officer Odham received a call from a confidential informant. Id. at

68. The confidential informant told him that Williams was in the area of Barclay Hills and Market

Street in Wilmington, was walking towards Princess Place Drive, and was wearing a gray sweatshirt

_____

[1] At the July 2014 sentencing hearing, the court adopted the facts set forth in the unobjected-
to portions of the PSR. See [D.E. 64], Sentencing Tr. 5–6; Fed. R. Crim. P. 32(i)(3)(A). The court
makes these findings of fact from the PSR and from the evidence presented at the sentencing
hearings.

2

and carrying a red back pack. See id. Officer Odham then had the police dispatcher alert any officers in that area to arrest Williams pursuant to the pending arrest warrant. See id. at 68–69.

Two officers from the Wilmington Police Department, Detective Kenneth Becker ("Detective Becker") and Detective Ian Lovell ("Detective Lovell"), were in the area and responded. Id. at 69. As Detectives Becker and Lovell approached in their car, they observed Williams get into a car. See id. at 15. The detectives then conducted a traffic stop on the car in order to arrest Williams. Id. at 18. Cordova was driving, and Williams was in the passenger seat. Id. at 18, 20. Upon seeing the officers activate their blue lights, Williams jumped from Cordova's car and ran. Id. at 17–18. Detective Lovell exited his car and ran after Williams. Id. at 18–19.

Meanwhile, Detective Becker got out of his car and approached Cordova, who was sitting in the car's driver's seat. Id. at 19–20. Cordova appeared extremely nervous. Id. at 20–21. Detective Becker asked Cordova about the car's passenger. Id. Cordova responded that the passenger was a friend and that he was giving him a ride. Id. at 21–22. Detective Becker commented that it was odd that Cordova's friend jumped out of the car and ran and then asked Cordova if he had drugs or guns on him. Id. at 2. Cordova handed a bag containing approximately 12.85 grams of marijuana to Detective Becker. Id. at 22–23. Detective Becker placed the marijuana on top of the car. Id. at 23. Cordova remained extremely nervous. Id. at 23. Detective Becker then asked Cordova to step out of the car. Id. at 24. Cordova appeared to reach for a phone. Id. Detective Becker told Cordova not to worry about the phone. Id. The car door was open, and Detective Becker decided to handcuff Cordova. See id. at 24–25. Detective Becker put one handcuff on Cordova's left wrist. Id. at 25. Cordova then resisted, pulled Becker into the car, pulled out a loaded semi-automatic pistol from his waistband, pointed it at Detective Becker, and fired. Id. at 25–26. Cordova missed. Id. Detective Becker escaped, drew his service weapon, ran towards

3

the back of Cordova's car, and returned fire through the back windshield of Cordova's car, but missed Cordova. Id. at 26–27. Cordova then ran from the car in the same direction that Williams had fled. Id. at 27–28. While fleeing, Cordova encountered Detective Lovell and approached him with his weapon raised. Id. at 53. Detective Lovell shot Cordova in the left leg. Id. at 54. Despite his injury, Cordova ran and barricaded himself in a nearby storage shed. Id. at 73. After hours of negotiations, Cordova surrendered to law enforcement. Id. at 74. In the shed, law enforcement collected Cordova's semi-automatic pistol and a magazine loaded with ammunition. Id. at 79.

Before Cordova's initial sentencing hearing, the United States Probation Office ("probation") prepared the PSR. See [D.E. 54]. After detailing Cordova's extensive criminal history and calculating a criminal history score of 15, probation determined that Cordova was an armed career criminal based on three prior convictions: (1) a Massachusetts felony conviction for assault and battery with a dangerous weapon, see PSR ¶ 13; (2) a Massachusetts felony conviction for unlawful possession of a firearm during the commission or attempted commission of a felony, see id. ¶ 14; and (3) either a North Carolina felony conviction for second-degree burglary, see id. ¶ 21, or a North Carolina felony conviction for second-degree kidnapping. See id. ¶ 22.

Next, probation determined Cordova's base offense level to be 33 under U.S.S.G. § 2A2.1(a)(1), the attempted first-degree murder guideline. See id. ¶ 51. Probation then increased Cordova's base offense level by 6 levels under U.S.S.G. § 3A1.2(c)(1), which applies where the defendant "kn[e]w or ha[d] reasonable cause to believe that a person was a law enforcement officer, [and] assaulted such officer during the course of the offense or immediate flight therefrom" "in a manner creating a substantial risk of serious bodily injury." See id. ¶ 53. Finally, probation reduced Cordova's adjusted offense level of 39 by three levels for acceptance of responsibility. See id. ¶¶ 58–59. A total offense level of 36, coupled with a criminal history category of VI, yielded an

4

advisory guideline range of 324 to 405 months' imprisonment. See U.S.S.G. ch. 5, pt. A (sentencing table).[2]

Cordova made four objections to the PSR. See PSR add. First, Cordova contended that, under Massachusetts law, he was never convicted of the felony offense listed in paragraph 13, assault and battery with a dangerous weapon. Accordingly, he argued that the offense listed in paragraph 13 was not a predicate violent-felony conviction under the ACCA. Second, Cordova contended that he did not commit the offenses listed in paragraphs 21 and 22 "on occasions different from one another," see 18 U.S.C. § 924(e)(1), and that probation therefore improperly counted the two convictions as separate ACCA predicates. Third, Cordova contended that probation improperly applied the attempted first-degree murder cross reference because there was no evidence that Cordova shot at Detective Becker. Finally, Cordova contended that probation improperly applied the official-victim enhancement under U.S.S.G. § 3A1.2(c)(1). Cordova argued that, even if he did shoot at Detective Becker, applying this enhancement constituted impermissible double counting.

On July 15, 2014, the court began Cordova's sentencing hearing. See [D.E. 59]. At the hearing, the court heard evidence on Cordova's third and fourth objections. The government presented the testimony of three witnesses, Detective Becker, Detective Lovell, and Officer Odham.[3] Cordova also testified and stated (among other things) that he told Detective Becker that he had a gun before fleeing from the car, and that he never fired his gun on January 29, 2013. See Sentencing Tr. 96. After considering the evidence presented and the arguments of counsel, the court credited

---

[2] Because Cordova's adjusted offense level of 39 was higher than 34, his offense level under U.S.S.G. § 4B1.4(b)(3)(A), Cordova's status as an armed career criminal did not impact his total offense level in the PSR. See PSR ¶ 57.

[3] Officer Odham investigated Thomas's shooting and was familiar with the events of January 2 and 29, 2013.

5

the testimony of Detective Becker, Detective Lovell, and Officer Odham, and found that Cordova not only shot at Detective Becker, but also acted with the requisite premeditation and deliberation under U.S.S.G. § 2A2.1(a)(1) and that the enhancement under section 3A1.2(c)(1) was appropriate. See Sentencing Tr. 119–22; United States v. Frasier, 483 F. App'x 791, 793 (4th Cir. 2012) (per curiam) (unpublished); United States v. Upshaw, 474 F. App'x 233, 233 (4th Cir. 2012) (per curiam) (unpublished); United States v. Johnson, 457 F. App'x 330, 332 (4th Cir. 2011) (per curiam) (unpublished); United States v. Mial, 454 F. App'x 161, 162–63 (4th Cir. 2011) (per curiam) (unpublished); United States v. Smith, 344 F. App'x 856, 859 (4th Cir. 2009) (per curiam) (unpublished); United States v. Taylor, 337 F. App'x 342, 343 (4th Cir. 2009) (per curiam) (unpublished). Moreover, Cordova perjured himself during the sentencing hearing when he testified that he told Detective Becker about his weapon before pulling it from his waistband and when he testified that he had not fired his weapon on January 29, 2013. Cordova lied in an effort to mislead the court and to evade responsibility for his actions. Accordingly, the court overruled Cordova's third and fourth objections, applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1, and ruled that a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1 was not appropriate. See Sentencing Tr. 123.

Next, the court ordered both parties to submit briefs regarding whether Cordova was an armed career criminal subject to an enhanced sentence under 18 U.S.C. § 924(e). See id. 135–38. Specifically, the court directed both parties to address whether the offenses listed in paragraphs 13 and 14 could serve as predicate convictions, and whether the convictions listed in paragraphs 21 and 22 could be counted separately. The court continued Cordova's sentencing pending its receipt and review of the parties' briefs, which both parties submitted on July 21, 2014. See [D.E. 65, 66]. On September 4, 2014, the court completed Cordova's sentencing hearing.

6

II.

The Supreme Court has described the process for imposing a sentence under the advisory

sentencing guidelines as follows:

[A] district court should begin all sentencing proceedings by correctly calculating the applicable [United States Sentencing] Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

Gall v. United States, 552 U.S. 38, 49–50 (2007) (footnote and citations omitted); see Pepper v.

United States, 131 S. Ct. 1229, 1241–45 (2011); Nelson v. United States, 555 U.S. 350, 350–52

(2009) (per curiam); Spears v. United States, 555 U.S. 261, 263–64 (2009) (per curiam); Kimbrough

v. United States, 552 U.S. 85, 101 (2007) ("[W]hile the statute still requires a court to give respectful

consideration to the Guidelines, [United States v. Booker, 543 U.S. 220 (2005)] permits the court

to tailor the sentence in light of other statutory concerns as well." (citations and quotation omitted));

Rita v. United States, 551 U.S. 338, 357–58 (2007); United States v. Diosdado-Star, 630 F.3d 359,

363–66 (4th Cir. 2011); United States v. Carter, 564 F.3d 325, 328–30 (4th Cir. 2009); United States

v. Evans, 526 F.3d 155, 160–61 (4th Cir. 2008); United States v. Pauley, 511 F.3d 468, 473 (4th Cir.

2007). The court recognizes its duty within this framework to "make an individualized assessment

based on the facts presented," Gall, 552 U.S. at 50, and to "impose a sentence sufficient, but not

greater than necessary, to comply with the purposes set forth in [the sentencing statute]." 18 U.S.C.

7

§ 3553(a); see, e.g., Spears, 555 U.S. at 263–64; Kimbrough, 552 U.S. at 100–01; Carter, 564 F.3d at 328–30.

A.

First, the court must calculate Cordova's applicable advisory guideline range. Initially, the parties dispute whether Cordova is an armed career criminal subject to an enhanced sentence under 18 U.S.C. § 924(e). A defendant is subject to an enhanced sentence under 18 U.S.C. § 924(e) if he violated 18 U.S.C. § 922(g) and "has three previous convictions by any court referred to in section 922(g)(1) . . . for a violent felony or a serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e)(1). A defendant may challenge the determination that one of his previous convictions is a predicate offense under the ACCA by showing that (1) he was not "convicted" of the offense; (2) the offense is not a "violent felony" or "serious drug offense"; or (3) he committed the offense on the same "occasion" that he committed another predicate offense.

Cordova uses all three approaches. First, as for the offense listed in paragraph 13, Cordova does not dispute that a Massachusetts conviction for assault and battery with a dangerous weapon constitutes a "violent felony" under the ACCA. See United States v. Hart, 674 F.3d 33, 44 (1st Cir. 2012). Nonetheless, Cordova contends that he was not "convicted" of assault and battery with a dangerous weapon because the Massachusetts state court adjudicating his case continued the case without finding him guilty. In Massachusetts, such a disposition is called a "continuance without a finding," or "CWOF."[4] Second, as for the offense listed in paragraph 14, Cordova contends that

---

[4] On December 8, 1998, the Springfield District Court in Springfield, Massachusetts issued a complaint charging Cordova with assault and battery with a dangerous weapon, in violation of Mass. Gen. Laws ch. 265, § 15A. On January 8, 1999, Cordova filed a "Tender of Plea or Admission and Waiver of Rights" form with the Springfield District Court. In that form, Cordova tendered an "admission to facts sufficient for a finding of guilty," conditioned upon the court's willingness to continue the case without a finding instead of entering a guilty finding. After

8

the unlawful possession of a firearm during the commission or attempted commission of a felony is not a "violent felony" under the ACCA. Third, as for the offenses listed in paragraphs 21 and 22, Cordova contends that the court may not count them as two separate predicate convictions because he committed the two offenses on the same "occasion." See Def. Mem. [D.E. 66].

As the government concedes, the offense listed in paragraph 13, assault and battery with a dangerous weapon, cannot serve as a predicate conviction because Cordova was not convicted of the offense under Massachusetts law. See Gov't Mem. [D.E. 65] 4–5. Section 924(e) does not define the term "conviction." However, "[w]hat constitutes a conviction of [a "crime punishable by imprisonment for a term exceeding one year"] shall be determined in accordance with the law of the jurisdiction in which the proceedings were held." 18 U.S.C. § 921(a)(20); see, e.g., United States v. Santiago, 601 F.3d 1241, 1243–45 (11th Cir. 2010); United States v. Walters, 359 F.3d 340, 343–44 (4th Cir. 2004); United States v. Lender, 985 F.3d 151, 156 (4th Cir. 1993); United States v. Carey, 716 F. Supp. 2d 56, 59, 65–66 (D. Me. 2010). Thus, the court examines Massachusetts law. Under Massachusetts law, an "admission to facts sufficient for a finding of guilty," followed by a CWOF, is not a conviction. See, e.g., In re Elias, 494 B.R. 595, 603 (Bankr. D. Mass. 2013); Commonwealth v. Villalobos, 437 Mass. 797, 802, 777 N.E.2d 116, 120–21 (2002); Commonwealth v. Jackson, 45 Mass. App. Ct. 666, 670, 700 N.E.2d 848, 852 (1998). Accordingly, the offense listed in paragraph 13 cannot serve as a predicate conviction for a violent felony under the ACCA.[5]

---

conducting an oral colloquy pursuant to Rule 12 of the Massachusetts Rules of Criminal Procedure, the district court entered a CWOF, conditioned upon Cordova's successful completion of one year of probation. On October 26, 2000, the underlying charge was dismissed. See PSR ¶ 13; United States v. Morillo, 178 F.3d 18, 19 (1st Cir. 1999) (explaining the CWOF procedure); United States v. Colon, No. 2:06-cr-121, 2007 WL 4246470, at *2 (D. Vt. Nov. 29, 2007) (unpublished) (same).

[5] The fact that Massachusetts CWOF dispositions are counted under U.S.S.G. § 4A1.2(f) to calculate a defendant's criminal history score is irrelevant to whether a Massachusetts CWOF

9

In contrast, the offense listed in paragraph 14, unlawful possession of a firearm during the commission or attempted commission of a felony in violation of Mass. Gen. Laws ch. 265, § 18B, serves as a predicate conviction for a violent felony under the ACCA. In reaching this conclusion, the court begins with the text of the relevant statutes. In pertinent part, Mass. Gen. Laws ch. 265, § 18B provides that "[w]hoever, while in the commission of or the attempted commission of [a felony], has in his possession or under his control a firearm, rifle[,] or shotgun shall, in addition to the penalty for such offense, be punished by imprisonment . . . for not less than five years."[6] In pertinent part, 18 U.S.C. § 924(e)(2)(B) defines "violent felony" as "any crime punishable by imprisonment for a term exceeding one year" that

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B)(i)–(ii).

The unlawful possession of a firearm during the commission or attempted commission of a felony does not have "as an element the use, attempted use, or threatened use of physical force against the person of another." Nor is it one of the enumerated offenses under section 924(e)(2)(B)(ii). Accordingly, the unlawful possession of a firearm during the commission or

---

disposition is a "conviction" under the ACCA. See, e.g., Carey, 716 F. Supp. 2d at 58 n.3; see also United States v. Fraser, 388 F.3d 371, 374–75 (1st Cir. 2004) (per curiam); United States v. Reyes, 386 F.3d 332, 333–34 & n.2 (1st Cir. 2004) (per curiam).

[6] Mass. Gen. Laws ch. 265, § 18B was last amended in July 1998. See Commonwealth v. Hines, 449 Mass. 183, 187, 866 N.E.2d 406, 409 (2007) (explaining the amendment). The version of the statute under which Cordova was convicted is the same as the current version.

attempted commission of a felony is a violent felony only if it satisfies the requirements of the "residual clause" of section 924(e)(2)(B)(ii)—that is, if the offense "otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii).

To determine whether Cordova's conviction under Mass. Gen. Laws ch. 265, § 18B falls within the residual clause of 18 U.S.C. § 924(e)(2)(B)(ii), the court employs the categorical approach. See, e.g., Taylor v. United States, 495 U.S. 575, 602 (1990). Under the categorical approach, the court "consider[s] whether the elements of the offense are of the type that would justify its inclusion within the residual provision, without inquiring into the specific conduct of th[e] particular offender." James v. United States, 550 U.S. 192, 202 (2007) (emphasis omitted); see, e.g., Descamps v. United States, 133 S. Ct. 2276, 2283 (2013); Begay v. United States, 553 U.S. 137, 144–48 (2008); Taylor, 495 U.S. at 602; United States v. Martin, 753 F.3d 485, 488 (4th Cir. 2014); United States v. Hemingway, 734 F.3d 323, 337 (4th Cir. 2013); United States v. Carthorne, 726 F.3d 503, 510 (4th Cir. 2013).

To determine whether an offense falls within the ACCA's residual clause, a court must determine "whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." James, 550 U.S. at 208. To make this determination, a court must answer three questions. First, the court must determine whether the offense poses "a serious potential risk of injury to another." Id. at 550. Second, the court must determine whether the offense poses a comparable level of risk to its closest analog among the offenses enumerated in section 924(e)(2)(B)(ii), namely, burglary, arson, extortion, or an offense that involves use of explosives (the "degree-of-risk test"). Finally, if the second requirement is met, the court must determine whether the offense is similar in kind to the enumerated offenses in section 924(e)(2)(B)(ii) (the "similar-in-kind test"). See, e.g., Sykes v. United States, 131 S. Ct. 2267,

11

2270–77 (2011); Chambers v. United States, 555 U.S. 122, 123–30 (2009); Begay, 553 U.S. at 139–48; James, 550 U.S. at 195–214; Martin, 753 F.3d at 487–94.

Here, the answer to the first question is straightforward. If a person possesses a firearm while he commits or attempts to commit a felony, there is a serious potential risk of injury in the ordinary case due to the serious potential that he will intentionally or recklessly discharge the firearm. Therefore, his conduct poses "a serious potential risk of injury" to the victims of his crime, innocent bystanders, the police, and even his co-defendants. See James, 550 U.S. at 208. State legislatures and Congress have reached the same conclusion, and have enacted laws punishing such conduct with mandatory minimum sentences. See, e.g., Mass. Gen. Laws ch. 265, § 18B (5-year mandatory minimum sentence for possession of a firearm during the commission or attempted commission of a felony); 18 U.S.C. § 924(c) (5-year mandatory minimum sentence for carrying a firearm in furtherance of any crime of violence or drug-trafficking crime). Similarly, the Sentencing Guidelines instruct courts to enhance a defendant's sentence when a defendant possesses a firearm in connection with a whole host of crimes. See, e.g., U.S.S.G. § 2B2.1(b)(4) (burglary of a residence or a structure other than a residence); id. § 2B2.3(b)(2) (trespass); id. § 2B3.1(b)(2)(C), (E) (robbery); id. § 2B3.2(b)(3)(A)(iii), (v) (extortion by force, threat of injury, or serious damage); id. § 2B5.1(b)(4) (offenses involving counterfeit bearer obligations of the United States); id. § 2D1.1(b)(1) (drug-trafficking crimes); id. § 2E2.1(b)(1)(C) (making or financing an extortionate extension of credit); id. § 2L1.1(b)(5)(C) (smuggling, transporting, or harboring an unlawful alien).

As for the second question, the potential risk required is far from a "metaphysical certainty." James, 550 U.S. at 207. By modifying the word "risk" with "potential," "Congress intended to encompass possibilities even more contingent or remote than a simple 'risk,' much less a certainty." Id. at 207–08. Here, the Fourth Circuit's decision in United States v. Mobley, 687 F.3d 625 (4th Cir.

12

2012), informs the court's analysis. In Mobley, the Fourth Circuit concluded that a conviction for possession of a shank in prison, in violation of 18 U.S.C. § 1791(a)(2), constitutes a "crime of violence" under U.S.S.G. § 4B1.2(a)(2)'s residual clause. See id. at 626–32.[7] The Fourth Circuit observed that "there is no innocent purpose for the possession of a dangerous weapon by a prison inmate." Id. at 630. Unlike a felon who possesses a firearm, who disobeys the law even though he might "have a legitimate use intended for the firearm, such as target shooting or collecting," a prison inmate possesses a shank to attack other inmates or staff or to protect himself against attack. Id. (quotation omitted).[8] Against this background principle, the Fourth Circuit concluded that possession of a shank in prison poses the same degree of risk associated with burglary, as "the main risk of an inmate in possession of a deadly weapon is the possibility of a face-to-face confrontation with another person." Id. (quotations omitted).

Under Mobley, possession of a firearm during the commission or attempted commission of a felony passes Sykes's degree-of-risk test. There is no lawful reason "in the ordinary case" for a person to possess a firearm while committing or attempting to commit a felony. James, 550 U.S. at 208. A person who possesses a firearm while committing or attempting to commit a felony does

---

[7] In determining whether a defendant's prior conviction is a violent felony under the ACCA, the court properly relies on cases interpreting U.S.S.G. § 4B1.2, because section 4B1.2's definition of "crime of violence" and the ACCA's definition of "violent felony" are practically identical. See, e.g., United States v. Clay, 627 F.3d 959, 965 (4th Cir. 2010).

[8] The possession of a firearm by a felon does not qualify as a "violent felony" under the ACCA. See, e.g., Royce v. Hahn, 151 F.3d 116, 120 (3d Cir. 1998); United States v. Oliver, 20 F.3d 415, 416–18 (11th Cir. 1994) (per curiam); United States v. Garcia-Cruz, 978 F.2d 537, 543 (9th Cir. 1992); United States v. Doe, 960 F.2d 221, 224–25 (1st Cir. 1992) (Breyer, C.J.); accord Stinson v. United States, 508 U.S. 36, 47 (1993) ("Federal courts may not use the felon-in-possession offense as the predicate crime of violence for purposes of imposing the career offender provision of U.S.S.G. § 4B1.1 as to those defendants to whom Amendment 433 applies."); United States v. Johnson, 953 F.2d 110, 115 (4th Cir. 1991) (holding that possession of a firearm by a felon is not a "crime of violence" under U.S.S.G. § 4B1.2).

13

so to facilitate his commission or attempted commission of a felony. In the ordinary case, such possession emboldens the person to act, protects the person against attack, and can be used if confronted by police, his victims, or even co-defendants who turn on him. Cf. Hines, 449 Mass. at 190, 866 N.E.2d at 411 (noting nexus required "between the felony and the firearm in terms of proximity, and logical relation to the nature of the felony itself . . . before [a] conviction [under Mass. Gen. Laws ch. 265, § 18B] can result"). Burglary and possession of a shank in prison "in the ordinary case" are dangerous because violence almost certainly will ensue if the defendant is confronted. See Sykes, 131 S. Ct. at 2273; James, 550 U.S. at 208; Mobley, 687 F.3d at 630–31. Common sense dictates the same conclusion "in the ordinary case" for possession of a firearm during the commission or attempted commission of a felony. There is a high degree of risk that, if confronted, a person who possesses a firearm while committing or attempting to commit a felony will use it. Cf. Sykes, 131 S. Ct. at 2274 (upholding the application of the ACCA based on what it described as "the commonsense conclusion that Indiana's vehicular flight crime is a violent felony"); James, 550 U.S. at 207–09; Mobley, 687 F.3d at 630–31; United States v. Foster, 674 F.3d 391, 395 (4th Cir. 2012) (Wilkinson, J., concurring in the denial of rehearing en banc) (observing that the Supreme Court has relied on "simple common sense . . . in ACCA cases for five straight years and counting"); United States v. Stephens, 237 F.3d 1031, 1033–34 (9th Cir. 2001) (concluding that defendant's prior conviction under 18 U.S.C. § 924(c) is a violent felony under the ACCA's residual clause).

The fact that Mass. Gen. Laws ch. 265, § 18B criminalizes possession of a firearm during the attempted commission of a felony bolsters the court's degree-of-risk conclusion. In James, the Supreme Court concluded that "the risk posed by an attempted burglary that can serve as the basis for an ACCA enhancement may be even greater than that posed by a typical completed burglary."

14

James, 550 U.S. at 204. The Court reasoned that the risk of confrontation is higher with respect to attempted burglary, given that "outside intervention" by a property owner or law enforcement officer is typically what "prevents the attempt from ripening into completion." Id. By the same logic, while possession of a firearm during the commission of a felony involves a high level of potential violence, possession of a firearm during the attempted commission of a felony involves an even higher level of potential violence that justifies its categorization as a violent felony under the ACCA's residual clause.

As for the third question, possession of a firearm during the commission or attempted commission of a felony is similar in kind to the offenses enumerated in section 924(e)(2)(B)(ii). Under Begay, a crime passes the "similar-in-kind" test if it "typically involve[s] purposeful, violent, and aggressive conduct." Begay, 553 U.S. at 144–45 (quotations omitted). "To be purposeful, violent, and aggressive, a crime must have a mens rea of at least recklessness[.] [C]rimes that can be committed through negligent conduct do not satisfy the Begay inquiry." Martin, 753 F.3d at 493; cf. id. at 493–94 (fourth-degree burglary of a dwelling under Maryland law not purposeful, violent, and aggressive under Begay because conviction can be based on negligent conduct); United States v. Peterson, 629 F.3d 432, 439–40 (4th Cir. 2011) (involuntary manslaughter under North Carolina law not purposeful, violent, and aggressive under Begay because conviction can be based on negligent conduct); United States v. Rivers, 595 F.3d 558, 565 (4th Cir. 2010) (South Carolina's blue-light statute does not involve purposeful, aggressive, and violent conduct under Begay because it "explicitly criminalizes a broad swath of unintentional conduct").

Possession of a firearm during the commission or attempted commission of a felony under Massachusetts law passes Begay's similar-in-kind test because a conviction under Mass. Gen. Laws ch. 265, § 18B requires proof of knowing possession or control. See, e.g., Commonwealth v.

15

Williams, 68 Mass. App. Ct. 1117, 864 N.E.2d 42, 2007 WL 1112520, at *5 (Apr. 13, 2007) (unpublished table decision). Moreover, because the Commonwealth also must prove a nexus between the firearm possession and the felony or attempted felony, a defendant convicted in Massachusetts of possessing a firearm during the commission or attempted commission of a felony necessarily has engaged in more "purposeful" behavior than a felon who possesses a firearm. See, e.g., Hines, 449 Mass. at 190, 866 N.E.2d at 411; Commonwealth v. Eller, 66 Mass. App. Ct. 564, 574–75, 849 N.E.2d 859, 867 (2006); cf. U.S.S.G. § 4B1.2 cmt. n.1 (noting that "crime of violence" does not ordinarily include the crime of unlawful possession of a firearm by a felon); Stephens, 237 F.3d at 1033–34 (drawing the same distinction between 18 U.S.C. § 924(c) and 18 U.S.C. § 922(g)(1)). Finally, although possession of a firearm during the commission or attempted commission of a felony "may not involve the same kind of 'active' violence and aggression" as some of the enumerated offenses, Mobley, 687 F.3d at 631, it certainly does not "amount[] to a form of inaction." Chambers, 555 U.S. at 123 (applying Begay and holding that failure to report for penal confinement under Illinois law, a crime characterized by inaction as opposed to active and aggressive conduct, was not a "violent felony" under the ACCA's residual clause). In any event, the Fourth Circuit concluded in Mobley that the act of possession, without more, can involve aggressive or violent behavior in the proper context. See Mobley, 687 F.3d at 631 (noting that possession of a shank in prison "involve[s] a similar level of potential violence and aggression reflected in the possession of" firearms described in 26 U.S.C. § 5845(a) outside of prison, because both crimes "prohibit the possession of dangerous weapons in contexts where they have no lawful purpose").

In sum, Cordova's Massachusetts's conviction for possession of a firearm during the commission or attempted commission of a felony is a "violent felony" under the ACCA's residual clause because the offense poses "a serious potential risk of physical injury to another," poses a

16

comparable level of risk to burglary, and typically involves purposeful, violent, and aggressive conduct. Accordingly, the conviction listed in paragraph 14 serves as Cordova's first predicate offense under the ACCA.

Finally, like the conviction listed in paragraph 14, the convictions listed in paragraphs 21 and 22 each serve as predicate offenses under the ACCA. As discussed, Cordova does not dispute that he was "convicted" of second-degree burglary and second-degree kidnapping under North Carolina law, respectively. See PSR ¶¶ 21–22. Likewise, Cordova does not dispute that these offenses are "violent felonies." 18 U.S.C. § 924(e)(2)(B). Rather, Cordova disputes whether he committed both offenses "on occasions different from one another." 18 U.S.C. § 924(e)(1).

Under the ACCA, "[c]onvictions occur on occasions different from one another if each of the prior convictions arose out of a separate and distinct criminal episode." United States v. Letterlough, 63 F.3d 332, 335 (4th Cir. 1995) (quotations and emphasis omitted). In determining whether Cordova's convictions in paragraphs 21 and 22 arose out of a separate and distinct criminal episode, the court begins by reviewing the facts underlying these two prior convictions, but only as they appear in certain so-called Shepard-approved documents: indictments, judgments, plea agreements, or transcripts of plea colloquies. See Shepard v. United States, 544 U.S. 13, 26 (2005); United States v. Boykin, 669 F.3d 467, 472 (4th Cir. 2012). Armed with the relevant facts from Shepard-approved documents, the court then considers "(1) whether the offenses arose in different geographic locations; (2) whether the nature of each offense was substantively different; (3) whether each offense involved different victims; (4) whether each offense involved different criminal objectives; and (5) whether the defendant had the opportunity after committing the first-in-time offense to make a conscious and knowing decision to engage in the next-in-time offense." United States v. Carr, 592 F.3d 636, 644 (4th Cir. 2010). The court may "consider these factors together

17

or independently, and if any one of the factors has a strong presence, it can dispositively segregate an extended criminal enterprise into a series of separate and distinct episodes." Id. (quotation omitted).

The court has reviewed the indictments and the judgments for the convictions listed in paragraphs 21 and 22. See [D.E. 71]; [D.E. 71-2]; [D.E. 71-4]; [D.E. 71-7]. These Shepard-approved documents state that on May 1, 2010, Cordova:

> unlawfully, willingly, and feloniously during the night time between the hours of 3:30am and 4:00am break and enter the dwelling house of Randel Riggsbee located at 1344 Hill Valley Walk Wilmington, NC 28412. The defendant broke and entered with the intent to commit a felony therein, larceny.

[D.E. 71] Indictment ¶ 2. Likewise, on May 1, 2010, Cordova:

> unlawfully, willingly, and feloniously did kidnap Irene Aranda Lopez, a person who had attained the age of 16 years by confining, restraining and/or removing her without her consent, and for the purpose of using the victim as a shield, facilitating the commission of a felony and facilitating the flight of Jermaine Cordova following the defendant's participation in the commission of a felony. Irene Aranda Lopez was not released by the defendant in a safe place.

[D.E. 71-4] Indictment ¶ 1. On November 8, 2010, Cordova pleaded guilty to each distinct violent felony. See [D.E. 71-2] Judgment; [D.E.71-7] Judgment.

The Shepard-approved documents demonstrate that the convictions listed in paragraphs 21 and 22 "arose out of a separate and distinct criminal episode." Letterlough, 63 F.3d at 335. After breaking into Riggsbee's residence, Cordova could have chosen not to kidnap Lopez. Instead, he committed a separate crime against a separate victim (i.e., Lopez) and made a conscious and knowing decision to kidnap Lopez in order to facilitate his escape from the location of the burglary. See, e.g., Carr, 592 F.3d at 644–45. Accordingly, the convictions listed in paragraphs 21 and 22 each count as predicate offenses under the ACCA. See, e.g., Carr, 592 F.3d at 645 (concluding that the defendant's crimes were distinct under the ACCA because they had different victims and the

defendant "had the opportunity to make a conscious and knowing decision to cease and desist his criminal behavior or engage in yet another crime" (quotation omitted)); United States v. Williams, 187 F.3d 429, 430–31 (4th Cir. 1999) (concluding that the defendant's firing a gun at one police officer while fleeing occurred on a different occasion under the ACCA from the defendant's pointing his gun at two other police officers a short time later during the chase); United States v. Hobbs, 136 F.3d 384, 389 (4th Cir. 1998) (noting that the fact of multiple victims "decisively tip[ped] the scales" in favor of concluding that each conviction was a separate occasion under the ACCA); cf. United States v. Godinez, 998 F.2d 471, 472–73 (7th Cir. 1993) (concluding that, where defendant kidnapped a woman to facilitate a subsequent robbery, both crimes were two separate incidents for ACCA purposes even though the kidnapping and the robbery overlapped).

In sum, Cordova is an armed career criminal based on the violent-felony convictions in paragraphs 14, 21, and 22. In light of Cordova's perjury during the sentencing hearing, the court did not give Cordova acceptance of responsibility under U.S.S.G. § 3E1.1. Moreover, in light of Cordova's perjury during the sentencing hearing, the court increased his offense level by two levels under U.S.S.G. § 3C1.1 for obstruction of justice. Thus, Cordova's total offense level is 41. Based on a total offense level of 41 and a criminal history category of VI, Cordova's advisory guideline range is 360 months' imprisonment to life imprisonment.

B.

The court next considered whether the advisory guideline range served the factors set forth in 18 U.S.C. § 3553(a). The court recognized its obligation to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." 18 U.S.C. § 3553(a); see, e.g., Spears, 555 U.S. at 264–68; Gall, 552 U.S. at 49–50. These purposes include the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the

19

law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(2)(A)–(C). Of course, the court considered, as appropriate, all relevant factors in 18 U.S.C. § 3553(a), the arguments of counsel, and Cordova's allocution. The court then selected a sentence in light of the section 3553(a) factors, and adequately explained the rationale for its sentence. See Spears, 555 U.S. at 264–68; Gall, 552 U.S. at 46, 50; Carter, 564 F.3d at 328; Evans, 526 F.3d at 164–65.

As for the seriousness of the offense, Cordova pleaded guilty to possession of a firearm and ammunition by a felon. The offense is very serious. Moreover, Cordova' felonious possession of a firearm and ammunition is a very atypical felon-in-possession case and is even more serious. Cordova not only illegally possessed a firearm and ammunition, he also fired a shot from his weapon that miraculously missed Detective Becker. Cordova then fled and encountered Detective Lovell. Cordova raised his weapon towards Detective Lovell. After Detective Lovell shot Cordova in the leg, Cordova managed to flee and barricade himself in a storage shed.

As for Cordova's history and characteristics, Cordova is a violent, dangerous man, who has no respect for the law. Cordova's criminal history began in 1996 at age 19, when he pleaded guilty to bribery of a public servant and criminal possession of a loaded firearm. See PSR ¶ 19. He served less than three years in prison, was paroled, and had his parole revoked. See id. In 1999, Cordova was charged in Massachusetts with assault and battery with a dangerous weapon and (as discussed) was able to resolve the charge with a CWOF. See PSR ¶ 13. The offense conduct involved Cordova assaulting his victim in the head with a metal pipe. See id.

In 2003 and 2004, Cordova was convicted of possession of marijuana in a public place, criminal contempt, and driving while license revoked. See PSR ¶¶ 15–17. Again, the legal system treated Cordova leniently. Id. Again, however, Cordova returned to a life of crime.

20

In 2005, Cordova was convicted of criminal trespassing to public housing and false report to law enforcement. See id. ¶¶ 18–19. Again, the legal system treated Cordova leniently. See id. Again, however, Cordova returned to a life of crime.

In 2008, Cordova (then age 31) pleaded guilty to possession of a firearm without a firearm identification card and possession of ammunition without a firearm identification card. See id. ¶ 20. Officers discovered the loaded weapon in Cordova's residence (along with 281 packets of heroin). See id. Again, the legal system again treated Cordova leniently, and he received a two-year sentence. Id. Again, however, Cordova returned to a life of crime.

In 2010, Cordova (then age 33) committed second-degree burglary of Randel Riggsbee's home in Wilmington. See PSR ¶ 21. After burglarizing Riggsbee's home, Cordova then kidnapped Irene Lopez to facilitate his escape. See id. ¶ 22. For these offenses, the state court sentenced Cordova to relatively brief custodial sentences, but suspended them. See id. ¶¶ 21–22. Thus, Cordova was free in January 2013, and able to participate in the robbery and armed assault of Kareem Thomas on January 2, 2013, and then to possess the loaded firearm that he used to shoot at Detective Becker on January 29, 2013. Cordova also perjured himself during the sentencing hearing on July 15, 2014.

As for Cordova's history and characteristics, he has no known history of substance abuse. See PSR ¶ 41. Moreover, Cordova obtained his GED in 1999, a B.S. in 2003, and an M.A. in 2006. See PSR ¶ 42. Notwithstanding his lack of substance abuse and intelligence, Cordova has a spotty work history and a long history of serious criminal behavior and violence.

The court imposed a sentence that reflects the serious nature of the offense and the need to promote respect for the law. Moreover, specific deterrence is critical in this case. Cordova has shown through his long history of violent criminal behavior that he is a profound and continuing

21

Case 7:13-cr-00090-D   Document 77   Filed 09/09/14   Page 21 of 23

threat to society. Society needs protection from Cordova. Furthermore, the sentence imposed provides general deterrence. In imposing the sentence, the court considered all arguments of Cordova's counsel, the letters that counsel submitted, and Cordova's allocution. Cordova's remorse and denials concerning his conduct were not credible, and the court believes that Cordova is and remains a profound threat to society.

Having fully considered the entire record in this case, all relevant section 3553(a) factors, the arguments of counsel, and Cordova's allocution, the court sentenced Cordova to 420 months' imprisonment. The court announced the remainder of the judgment in open court and incorporates that discussion by reference.

Finally, the court believes that it properly calculated the advisory guideline range. Nonetheless, if it has not, the court has thoroughly considered all of the relevant section 3553(a) factors and articulated the rationale for Cordova's sentence. Accordingly, the court notes that if the ACCA applies and it has not properly calculated the advisory guideline range, the court would impose the same sentence as an alternative variant sentence. See, e.g., United States v. Gomez-Jimenez, 750 F.3d 370, 382–86 (4th Cir. 2014); United States v. Hargrove, 701 F.3d 156, 160–65 (4th Cir. 2012); United States v. Savillon-Matute, 636 F.3d 119, 123–24 (4th Cir. 2011). Cordova's sentence is the sentence that is sufficient but not greater than necessary in this case.

III.

In sum, the court has imposed Cordova's sentence for the reasons discussed herein and the reasons discussed in open court, which are incorporated by reference. This order is intended to provide a statement of reasons for Cordova's sentence, and does not alter or amend the court's judgment announced in open court.

22

SO ORDERED. This __9__ day of September 2014.

JAMES C. DEVER III
Chief United States District Judge